UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x

GUILLERMO T. ORTIZ and                  :
CHRISTOPHER ABREU,                       :
                                         :
                      Plaintiffs,        :
                                         :          **OPINION AND ORDER**
         - against -                     :
                                         :           06 Civ. 2208 (ER)
THE VILLAGE OF MONTICELLO, NEW YORK, :
COUNTY OF SULLIVAN, NEW YORK,            :
DOUG SOLOMON, MARK JOHNSTONE,            :
and DONALD BUCKNER                        :
                                         :
                      Defendants.        :

————————————————————————x

Defendants Sullivan County, New York ("Sullivan County" or the "County") and Donald Buckner ("Detective Buckner" or "Buckner") (collectively, "County Defendants"), and Defendants Village of Monticello, New York ("Village of Monticello" or the "Village"), Doug Solomon ("Chief Solomon" or "Solomon") and Mark Johnstone ("Sergeant Johnstone" or "Johnstone") (collectively, "Village Defendants"), bring Motions for Summary Judgment seeking dismissal of Plaintiffs' First Amended Complaint in its entirety pursuant to Federal Rule of Civil Procedure 56.  Docs. 46, 52.[1]  For the reasons set forth below, the Court GRANTS judgment to Defendants on the federal claims against them, declines to retain supplemental jurisdiction over the state law claims and dismisses Defendants' cross-claims.

---

[1] Defendants request dismissal of both the Complaint and the First Amended Complaint.  However, the filing of an amended complaint generally supersedes the original complaint and renders the original pleading "of no legal effect."  *Azkour v. Haouzi*, 11 Civ. 5780 (RJS) (KNF), 2012 WL 1681438, at *1 (S.D.N.Y. Apr. 25, 2012) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994)) (internal quotation marks omitted), *report and recommendation adopted*, 11 Civ. 5780 (RJS) (KNF), 2012 WL 2125951 (S.D.N.Y. June 12, 2012).  Accordingly, the Court will only consider the First Amended Complaint.

## I. Background

### A. Facts

The following facts are undisputed except where otherwise noted.[2]

On November 29, 2005, at approximately ten-thirty in the morning, Chief Solomon and Sergeant Johnstone responded to Tyla Walker's ("Walker") home on Hillside Avenue, in Monticello, New York, to investigate complaints of a domestic dispute between Walker and Renando Torres ("Torres"). Cnty. Defs.' 56.1 Stmt. ¶ 1, Doc. 45; Waye Decl. Ex. F ("Solomon Dep.") at 9.[3]  Solomon and Johnstone were familiar with Torres, a Hispanic male in his twenties, as he had had various contacts with police in the past. Solomon Dep. at 5-7; Piscitelli Decl. Ex. N ("Johnstone Dep.") at 4-5;[4] Piscitelli Decl. Ex. P ("Domestic Incident Report") at 7.  At Walker's home, her mother informed Solomon that she believed Torres had a gun hidden in her daughter's apartment.  However, when Solomon questioned Walker about the weapon, she refused to answer. Cnty. Defs.' 56.1 Stmt. ¶ 3.  After spending approximately fifteen minutes at Walker's apartment, Solomon and Johnstone headed back to the police station. Solomon Dep. at 12.

While en route, Solomon and Johnstone observed police vehicles with lights and sirens heading in the direction from which they had come.  Solomon learned from the police radio that

---

[2] Plaintiffs' counsel has failed to abide by my Individual Practices, with which he should be familiar given his many cases before this Court, and which require that a party opposing summary judgment reproduce each entry in the moving party's Local Rule 56.1 Statement and set out the opposing party's response directly beneath it.  I will excuse this failure in the interest of deciding the matter on the merits.  In the future, however, I expect Plaintiff's counsel to comply with my Individual Practices.

[3] Waye Decl. refers to the Attorney Declaration of Judith A. Waye, attorney for County Defendants, in support of Defendants' motion for summary judgment.  Doc. 47.

[4] Piscitelli Decl. refers to the Attorney Declaration of Alyson Piscitelli, attorney for Village Defendants, in support of Defendants' motion for summary judgment.  Doc. 54.

Torres was alleged to have pointed a gun at Walker.  Vill. Defs.' 56.1 Stmt. ¶ 1, Doc. 55.

Solomon and Johnstone immediately returned to Walker's home, whereupon they learned that

Walker's father had called police to report that Torres had pointed a gun at his daughter.

Solomon Dep. at 14.  Furthermore, they confirmed[5] that Torres did have a gun and he had placed

the gun in Walker's mouth.  *Id*. at 16; Johnstone Dep. at 9. [6]

After their second visit to Walker's residence, Solomon and Johnstone responded

separately to Torres' home, which they believed to be located at an apartment complex on 100

Wood Avenue, in Monticello, New York.   Solomon Dep. at 18; Johnstone Dep. at 10-11.[7]

Although the exact timing is unknown, at some point Torres' apartment was identified as

Apartment # 6.  *Id*. at 18; Johnstone Dep. at 11.  Officers from the Village police department,

County officers and state troopers went to the apartment complex as well.  Solomon Dep. at 18.

Upon arriving at the Wood Avenue apartment complex, Solomon obtained Torres'

cellular telephone number from an officer at the scene and telephoned Torres from his police

vehicle.  Solomon Dep. at 19-20.  Solomon's vehicle was parked around the corner from

Apartment  # 6 and he could not see the apartment.  *Id*. at 20.  Over the telephone, Solomon

explained to Torres that the police were at his home and they wanted him to surrender.  *Id*.

---

[5] Solomon's deposition testimony does not indicate how police confirmed that Torres owned a gun, however, Solomon discussed the weapon when describing a conversation he had with Walker during his second visit to her home.  Solomon Dep. at 16.

[6] Village police also learned that Walker had obtained an Order of Protection against Torres, although the parties dispute when police learned of the existence of the order.

[7] At 11:25 that morning, Johnstone issued Torres a traffic ticket on West Broadway charging him with aggravated unlicensed operation in the third degree.  Piscitelli Decl. Ex. P ("Simplified Traffic Information") at 10.  It is unclear whether the traffic ticket was issued before or after police's second visit to Walker's home as the record indicates conflicting information.  *See* Piscitelli Decl. Ex. P ("Vill. Police Dep't Case Rpt.") at 1-5 (noting that police's second visit occurred after 11:30 a.m.); Solomon Dep. 9, 12-13 (indicating that police's first visit was at 10:30 a.m., lasted fifteen minutes and police headed back to Walker's home within five minutes of their initial departure).

Torres replied that he was in a car with another male who was driving him to his attorney's office, but Solomon did not credit the story and believed that Torres was inside his apartment. *Id.* at 21, 27. Solomon made two or three telephone calls to Torres from his vehicle, and at one point spoke to Torres' driving companion. *Id.* Sometime during these calls, Solomon was informed that officers looking through a window had seen two Hispanic males in their early twenties inside Apartment # 6. *Id.* at 22-23.

Upon arriving at the Wood Avenue apartment complex, Sergeant Johnstone positioned himself near the doorway of the building housing Apartment # 6. Johnstone Dep. at 14-15. He too was under the impression that Torres was inside the apartment. *Id.* at 14.

In the meantime, the Village police department's efforts to locate Torres were broadcast over the police radio. Torres was identified as a Hispanic male who was armed, had been involved in a domestic dispute, and was being sought at an apartment located at Wood Avenue in Monticello, New York. Cnty. Defs.' 56.1 Stmt. ¶ 8. Detective Buckner, employed by the County's Sheriff's patrol, overheard the radio broadcast and proceeded to the apartments to assist his fellow officers. *Id.* ¶ 10. It was common practice for police officers from local jurisdictions to automatically respond to a police radio report when the crime involved a gun. Vill. Defs.' 56.1 Stmt. ¶ 2.

Upon arriving at the apartment complex, Buckner was advised by Village police that the suspect's name was Torres and that he was believed to be inside Apartment # 6. Cnty. Defs.' 56.1 Stmt. ¶ 15. Buckner was also told that police were seeking to arrest Torres. Waye Decl. Ex. I ("Buckner Aff.") ¶ 6. Prior to this date, there is no evidence to suggest that Buckner knew or had ever met Torres. Cnty. Defs.' 56.1 Stmt. ¶ 12. Buckner, along with Johnstone and other officers, took positions near the door of the building housing Apartment # 6. Waye Decl. Ex. E

4

("Buckner Dep.") at 11; Buckner Aff. ¶ 7.  From his vantage point, Buckner could not see inside

Apartment # 6, but he was advised by Village police that there appeared to be two Hispanic

subjects inside the apartment.  Buckner Dep. at 10; Buckner Aff. ¶ 9.

In actuality, Torres did not reside in Apartment # 6, but in Apartment # 7.  Waye Decl.

Ex. G ("Abreu Dep.") at 43.  Apartment # 6 was inhabited by Plaintiff Christopher Abreu

("Abreu") and his parents, and on that day, Plaintiff Guillermo T. Ortiz ("Ortiz") was visiting

Abreu at the apartment.  Abreu Dep. at 5, 15-16.  Abreu and Ortiz (collectively, "Plaintiffs") are

Hispanic males in their twenties.  Waye Decl. Ex. H ("Ortiz Dep.") at 6; Abreu Dep. at 6, 30.

After this point in the narrative, the parties strongly contest each other's version of events

and the Court presents the version of events most favorable to Plaintiffs.  According to Plaintiff

Abreu, when he opened the door to the building which housed his apartment, Apartment # 6,

police officers came rushing out in front of him, while pointing their weapons, and told him to

"get the fuck out of the building, get on the floor, [and] put your arms out in the air."  Abreu

Dep. at 22.  Abreu complied and put his hands in the air.  *Id.* at 59.  He was then turned around,

thrown to the ground, handcuffed and a gun was placed on his back and near his face.  *Id.* at 24,

60.  He was then picked up by his hands and forced against a barbed wire fence.  *Id.* at 25.

Abreu alleges that Solomon was present during these events, as he was on the scene from

the moment Abreu exited his building.  *Id.* at 29-31.  Relatedly, at some point, Abreu was

escorted past Sergeant Johnstone, who recognized that he was not suspect Torres but did not

immediately communicate this knowledge to the other officers.  Johnstone Dep. at 18.  Abreu

does not know the identity of those who allegedly injured him and it is undisputed that neither

Solomon nor Johnstone touched Abreu.  Abreu Dep. at 24-25; Vill. Defs.' 56.1 Stmt. ¶ 12-13.

After Abreu was forced against the barbed wire fence, officers entered his apartment building, encountered Ortiz and pointed guns at his face.  Abreu Dep. at 26-27; Ortiz Dep. at 42.  Ortiz testified hearing Solomon say to police, "[L]et him come out on his own."  Ortiz Dep. at 42.  Police then backed out of the apartment and Ortiz came outside and said to them, "I'm not dangerous, I don't have any weapons."  *Id.* at 43.  He was told to "shut the fuck up, get the fuck on the floor."  *Id.*  Ortiz next told officers, "I'm turning around slowly, I'm putting my hands on the wall," to which the officers said, "[N]o, don't turn around," and ordered him to get on the ground.  *Id.* at 44.  In response, Ortiz began talking to the police, saying "[O]fficer please, with all due respect," and suddenly Buckner grabbed Ortiz's right hand by the wrist, twisted it behind his back and slammed him down to the ground.  *Id.* at 44.[8]  He then "saw a shotgun get cocked, and [the police] put pressure on [his] back and they put the shotgun in [his] face and they said shut the fuck up."  *Id.* at 45.  After being patted down, Ortiz was immediately lifted to the ground and brought to where Abreu was being held.  *Id.* at 47.  As soon as Ortiz and Abreu were brought together, police apologized to them for the incident and Plaintiffs allege that both Solomon and Buckner stated, "[T]hrough the window you appeared to be Hispanic."  *Id.* at 47-48; Abreu Dep. at 30.[9]

Plaintiffs subsequently learned that police had actually been searching for suspect Torres.  Abreu Dep. at 32.  Abreu described Torres as having long hair and being in his mid-to-late

---

[8] Although Ortiz does not mention Buckner by name in his deposition testimony describing the above incident, Buckner acknowledges that he was the officer who was involved with bringing Ortiz to the ground.  Buckner Aff. ¶ 14.

[9] At his deposition, Ortiz testified that the prior statement "feels and sounds like racial profiling to me."  Ortiz Dep. at 73.  When Abreu was asked at his deposition if the police had made other racial comments on the date in question, he replied, "Just the one that said you appeared to be Hispanic through the window.  That's the only one."  Abreu Dep. at 37.

twenties.  *Id.* at 39-40.  Abreu also alleged that police have been to Torres' apartment "[n]umerous times."  *Id.* at 33.

As a result of this encounter with police, Abreu claims that he sustained a few scratches for which he did not receive medical treatment.  *Id.* at 35.  Ortiz, on the other hand, testified that the incident produced migraine headaches, an injury to the rotator cuff of his right shoulder that required surgery and post-traumatic stress disorder.  Ortiz Dep. at 8, 16, 23, 61-62; Isseks Decl. Ex. 1 ("Medical Records of David Mack, M.D.") at 1-18.[10]

According to the undisputed facts, suspect Torres surrendered to police the following day, was arrested and charged with six offenses, including menacing in the second degree, subdivision 1.  Vill. Police Dep't Case Rpt. at 1-5; Piscitelli Decl. Ex. P ("Felony Complaints") at 11-16.

**B. Procedural History**

The First Amended Complaint filed by Plaintiffs on April 11, 2007 sets forth a civil rights action pursuant to 42 U.S.C. § 1983 ("§ 1983") against the Village and County (collectively, "Municipal Defendants") and Solomon, individually and as Chief of the Village of Monticello Police Department, Johnstone, individually and as a sergeant with the Village of Monticello Police Department, and Buckner, individually and as a detective with the Sullivan County Sheriff's Department (collectively, "the Officers"), alleging probable cause, due process, excessive force and equal protection violations pursuant to the Fourth and Fourteenth Amendments, and state law claims for negligence, false imprisonment, assault and battery, and

---

[10] Isseks Decl. refers to the Declaration of Robert N. Isseks, attorney for Plaintiffs, in opposition to Defendants' motions for summary judgment. Doc. 59.

an additional claim against the Municipal Defendants alleging failure to properly train their officers.  Amended Complaint ("Am. Compl.") ¶¶ 1-28, Doc. 12.[11]

Defendants Sullivan County and Detective Buckner answered and asserted cross-claims against the Village of Monticello, Chief Solomon and Sergeant Johnstone in the event of liability.  Doc. 13.  The Village of Monticello and Chief Solomon answered and likewise asserted cross-claims against Sullivan County and Detective Buckner.  Doc. 16.  Sergeant Johnstone also answered and asserted cross-claims against the other Defendants.  Doc. 17.

This case was reassigned to the undersigned on January 6, 2012.  Doc. 40.  Pursuant to a briefing schedule set by this Court, Defendants filed their motions for summary judgment on March 7, 2012 and March 9, 2012; Plaintiffs filed their opposition papers on April 9, 2012; and Defendants filed their replies on April 20, 2012 and April 24, 2012.  Docs. 45-48, 52-55, 57-60, 61, 65.

In their opposition to Defendants' motions for summary judgment, Plaintiffs voluntarily withdrew their claims against the Municipal Defendants pursuant to *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658 (1978).  Pls.' Mem. Law Opp. Defs.' Mots. Summ. Judg. ("Pls.' Mem.") 2 n.1, Doc. 60.  Accordingly, the Court will dismiss all § 1983 claims against the Village of Monticello and Sullivan County and claims against Chief Solomon, Sergeant Johnstone and Detective Buckner in their roles as municipal officers.  The issues remaining before this Court

---

[11] Defendants contend that Plaintiffs failed to comply with the notice and pleading requirements of New York General Municipal Law §§ 50-e and 50-i, which require filing a notice of claim as a condition for bringing state law claims against a municipality and its employees.  "A plaintiff's failure to comply with the mandatory New York statutory notice-of-claim requirements generally results in dismissal of his claims."  *Warner v. Vill. of Goshen Police Dep't*, 256 F. Supp. 2d 171, 175 (S.D.N.Y. 2003).  Plaintiffs do not contest Defendants' assertion and make no attempt to refute Defendants' argument that summary judgment should be granted as to the state law claims for failure to provide proper notice.  However, as the Court has declined to retain supplemental jurisdiction over Plaintiffs' state law claims, it will not address the implications of a potential failure to file a notice of claim.

are the § 1983 claims against the Officers in their individual capacities and the various state law claims.

## II. Discussion

### A.    Summary Judgment Standard

Summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)) (internal quotation marks omitted).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported

assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14,

18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some

metaphysical doubt as to the material facts."  *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir.

2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))

(internal quotation marks omitted).  To defeat a motion for summary judgment, "the non-moving

party must set forth significant, probative evidence on which a reasonable fact-finder could

decide in its favor."  *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby*, 477

U.S. 242, 256–57 (1986)).

**B. Background Law on Section 1983**

In this case, Plaintiffs Abreu and Ortiz allege four causes of action under New York

common law and four causes of action under 42 U.S.C. § 1983.  In order to state a claim under

Section 1983, a plaintiff must allege that:  (1) a right secured by the Constitution or federal law

was violated by defendants; and (2) the alleged violation was committed by a person acting

under color of state law.  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).

"Section 1983 is only a grant of a right of action; the substantive right giving rise to the

action must come from another source."  *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d

Cir. 1995) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)).  Thus, a civil rights

action brought under § 1983 will stand only insofar as the plaintiff can prove an actual violation

of his rights under the Constitution or federal law.  *Id.*

**C. Federal Claims against the Officers**

**1. Qualified Immunity**

Chief Solomon, Sergeant Johnstone and Detective Buckner have raised the defense of

qualified immunity.  "A government official sued in his individual capacity is entitled to

qualified immunity (1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken." *Manganiello v. City of New York*, 612 F.3d 149, 164 (2d Cir. 2010) (citations, brackets, ellipses, and quotation omitted).

The Second Circuit recently explained that "[q]ualified immunity thus affords government officials breathing room to make reasonable—even if sometimes mistaken— decisions, and protects all but the plainly incompetent or those who knowingly violate the law from liability for damages." *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (citations and quotations omitted). Therefore, "[w]hether qualified immunity applies in a particular case generally turns on the objective legal reasonableness of the challenged action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* (citations and quotations omitted).

The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Under a qualified immunity analysis, "[f]irst, a court must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," *id.*, and then "[s]econd, if the plaintiff has satisfied this first step, whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* The Supreme Court has allowed "district courts . . . to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

### 2. False Arrest Claim

Plaintiffs' first claim under § 1983 alleges that Chief Solomon, Sergeant Johnstone and Detective Buckner violated their Fourth Amendment rights by arresting them without probable cause. Am. Compl. ¶ 19. The Second Circuit has explained that a Section "1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006). In *Jaegly*, the panel stated that, "[i]n analyzing § 1983 claims for unconstitutional false arrest, we have generally looked to the law of the state in which the arrest occurred." *Id.* (citation and quotation omitted). "To state a claim for false arrest under New York law, a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (quotation omitted).

However, "[u]nder New York law, the existence of probable cause is an absolute defense to a false arrest claim." *Jaegly*, 439 F.3d. at 152. The Second Circuit has explained that "[a]n officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* (quotation omitted). Plaintiffs here do not dispute that the police had probable cause to arrest Torres. Pls.' Mem. 1-17. Notwithstanding, the Court will independently evaluate whether probable cause existed to arrest Torres as the result informs the determination of whether police had probable cause to detain Plaintiffs.

### a.  Arguable Probable Cause to Arrest Torres

Because the Defendants have raised qualified immunity as a defense, they need not

demonstrate that they had *actual* probable cause to arrest.  The Second Circuit has stated "in the

context of allegations of false arrest, that an arresting officer is entitled to qualified immunity

from a suit for damages on a claim for arrest without probable cause if either (a) it was

objectively reasonable for the officer to believe that probable cause existed, or (b) officers of

reasonable competence could disagree on whether the probable cause test was met."  *Lee v.

Sandberg*, 136 F.3d 94, 102 (2d Cir. 1997) (quotation and brackets omitted).  This more lenient

standard has become known as "arguable probable cause."  *See id.*; *see also Amore v. Novarro*,

624 F.3d 522, 536 (2d Cir. 2010) (applying arguable probable cause in a false arrest analysis).

After the mistaken detention of the Plaintiffs, Torres surrendered to police and was

charged with six offenses, including menacing in the second degree, subdivision one.  *See* Vill.

Police Dep't Case Rpt. at 1-5; Felony Complaints at 11-16.  Under New York Law, an individual

is guilty of menacing in the second degree, subdivision one when "[h]e or she intentionally

places or attempts to place another person in reasonable fear of physical injury, serious physical

injury or death by displaying a deadly weapon, dangerous instrument or what appears to be a

pistol, revolver, rifle shotgun, machine gun or other firearm."  N. Y. Penal Law §120.14

(McKinney 2012).

Here, the undisputed facts establish that Walker's mother informed Solomon and

Johnstone that she believed Torres had a gun hidden at her daughter's apartment.  Cnty. Defs.'

56.1 Stmt. ¶ 3.  Solomon and Johnstone then learned through the police radio that Torres had

pointed a gun at Walker, and were informed that Walker's father had called police to report the

threat.  Vill. Defs.' 56.1 Stmt. ¶ 1; Solomon Dep. at 14.  They also confirmed that Torres did

13

have a gun and that the gun had been placed in Walker's mouth.  Solomon Dep. at 16; Johnstone

Dep. at 9.  These facts plainly establish probable cause to arrest Torres for menacing because he

threatened Walker with a deadly weapon and placed the weapon in her mouth, thereby placing

Walker in reasonable fear of physical injury.  *See* N.Y. Penal Law §120.14 (McKinney 2012).

Accordingly, it was objectively reasonable for Solomon and Johnstone to conclude that they had

sufficient information to believe that Torres had violated § 120.14 in the course of his domestic

dispute with Walker.[12]  Thus, they had at least arguable probable cause to arrest Torres.

The Court also notes that the Officers had information, albeit mistaken, indicating that

Torres could be found at the 100 Wood Avenue apartment complex, specifically in Apartment #

6.  Solomon Dep. at 18; Johnstone Dep. at 11.  Furthermore, from his telephone conversation

with Torres, Chief Solomon had learned that Torres was in the company of another male, and

despite assurances of Torres to the contrary, Solomon did not credit the story and believed that

Torres was inside his apartment with the other male.  Solomon Dep. at 21, 27.  Solomon's belief

that Torres was inside Apartment # 6 was likely reinforced once he learned that officers had seen

two Hispanic males in their early twenties inside Apartment # 6.  *See id.* at 22-23.  However

mistaken, it was reasonable in these circumstances for the Officers to believe that Torres would

be found inside Apartment # 6.  *See Martinez v. Simonetti*, 202 F.3d 625, 635 (2d Cir. 2000) ("In

evaluating the probable cause determination, 'we consider the facts available to the officer at the

time of arrest.'") (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)).

---

[12] While the Court finds that the elements of menacing in the second degree are met on the facts of this case, it is not
necessary that Defendants show that they had (actual or arguable) probable cause to arrest Torres on that charge or
the other five charges against him.  "[A] claim for false arrest turns only on whether probable cause existed to arrest
a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or,
indeed, any charge actually invoked by the arresting officer at the time of arrest."  *Jaegly*, 439 F.3d at 153.
Accordingly, the Court need not analyze whether probable cause existed with respect to the balance of charges
against Torres.

Given our conclusion that Chief Solomon and Sergeant Johnstone had probable cause to arrest Torres, Detective Buckner, the officer physically involved in the seizure of Plaintiffs, also had probable cause.  An assessment of whether probable cause exists at the time of seizure "is to be made on the basis of the collective knowledge of the police, rather than on that of the arresting officer alone."  *Husbands ex rel. Forde v. City of New York*, 335 Fed. App'x 124, 127 (2d Cir. 2009).  Additionally, police officers are "entitled to rely on the allegations of fellow police officers."  *Simonetti*, 202 F.3d at 634.  Here, Buckner learned through a radio transmission that the police were searching for a Hispanic male in possession of a handgun, who had been involved in a domestic dispute and was believed to be at an apartment on Wood Avenue.  Cnty. Defs.' 56.1 Stmt. ¶ 8.  Upon reaching the Wood Avenue apartment complex, Village police advised Buckner that the suspect was believed to be located in Apartment # 6.  *Id.* ¶ 15.  Buckner was also informed by Village police that there appeared to be two Hispanic subjects inside Apartment # 6.  Buckner Dep. at 12.  There is nothing in the record to indicate that Buckner had any reason to doubt the accuracy of this information or that he acted unreasonably in relying on such information.  *See Husbands ex rel. Forde*, 335 Fed. App'x at 128 ("[W]hether probable cause exists does not depend on the accuracy of the fellow officer's observations, but rather whether it was reasonable for the arresting officer to rely on them.").

### b.  Probable Cause Based on Mistaken Information

Probable cause can also exist "where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information."  *Id.* at 127 (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)) (internal quotation marks omitted).  Defendants claim that they "maintained probable cause to detain and/or arrest Plaintiffs because Defendants reasonably, albeit mistakenly, believed that one of the Plaintiffs

was Renando Torres and that the other was a potential accomplice."  Cnty. Defs.' Mem. Law

Supp. Defs.' Mot. Summ. Judg. ("Cnty. Defs.' Mem.") 14, Doc. 48.  In support of their

argument, Defendants primarily rely on two cases, *Hill v. California*, 401 U.S. 797 (1971) and

*Martinez v. City of New York*, 340 Fed. App'x 700 (2d Cir. 2009).  Cnty. Defs.' Mem. 14-15.

In *Hill*, the Supreme Court stated that "when the police have probable cause to arrest one

party, and when they reasonably mistake a second party for the first party, then the arrest of the

second party is a valid arrest."  401 U.S. at 802 (citation and internal quotation marks omitted).

There, two men who had committed a robbery implicated petitioner Hill and provided police

with his address.  *Id.* at 798-99.  The police then reviewed official records to verify, among other

things, Hill's age, physical description and address.  Afterwards, they proceeded to Hill's

apartment, confirmed that they had the correct address, and knocked on the door.  A man fitting

Hill's description answered the door and, unable to convince the police that he was not Hill, was

arrested by police.  *Id.* at 799.  The police then conducted a search incident to the arrest which

uncovered evidence of Hill's participation in the robbery.  *Id.* 799-801.  The Court upheld the

search incident to the arrest since the officers reasonably, but mistakenly, believed that the

person arrested in Hill's home was the petitioner.  *Id.* at 804-05.

In *Martinez*, the Second Circuit upheld a summary judgment order in favor of defendants

City of New York and two police officers where an individual was arrested based on mistaken

identity.  *Martinez*, 340 Fed. App'x at 701-02.  At the time of the arrest, police officers knew that

there was an outstanding warrant for an individual with the same name and birth date as the

plaintiff.  *Id.* at 701.  However, the physical description in the warrant differed in "skin tone,

height, and weight from plaintiff's physical appearance," and the panel noted that the physical

differences were insufficient to uphold a false arrest claim when the two individuals had the

16

same name and birth date.  *Id.* at 701-02.  The panel, relying on *Hill*, observed that, "[i]f officers arrest an individual based on a mistaken identification, that arrest is still constitutionally valid if the police have probable cause to arrest the person sought and the arresting officer reasonably believed that the arrestee was that person."  *Id.* at 701.

The foregoing cases support the Officers' position.  The Officers here, as in *Hill*, had statements from individuals implicating Torres in a domestic violence dispute during which Torres used a gun to threaten Walker.  Officers also knew that Torres was a Hispanic man in his twenties.  Additionally, Officers obtained Torres' address including, although the source of the information is unclear, his apartment number, and proceeded to Torres' apartment complex, where police saw two Hispanic males inside Apartment # 6.

Like in *Martinez*, Plaintiffs fit some of Torres' characteristics but not his exact physical description; Torres was described as having long hair.  *See* Abreu Dep. at 39-40.  However, Plaintiffs matched Torres' description insofar as they were Hispanic males in their twenties and were at that time located in an apartment where Torres was believed to reside.  As noted by Defendants, it is unreasonable to expect police to rule out either plaintiff as suspect Torres based solely upon a difference in hair length.  Cnty. Defs.' Reply Mem. Law Supp. Defs.' Mot. Summ. Judg. ("Cnty. Defs.' Reply Mem.") 14, Doc. 61.

In their opposition to summary judgment, Plaintiffs rely solely on *Hill*.  Plaintiffs argue that unlike in *Hill*, police here did not reasonably mistake them for suspect Torres. Pls.' Mem. 10.  First, Plaintiffs note that in *Hill*, the police had a conversation with the arrestee prior to the arrest where he was unable to convince the police that he was not petitioner Hill.  *Id.*  In contrast, here "the Defendant officers did not even give the Plaintiffs a *chance* to arouse suspicion. No sooner did the Plaintiffs attempt to comply with the police directives, the Defendants yelled at

17

them to 'shut the fuck up' and slammed them to the ground." *Id.* 11. (emphasis in original)
Relatedly, Plaintiffs claim that Defendants could not establish probable cause before their
identities were verified. *Id.* 11. However, despite Plaintiffs' arguments to the contrary, "[o]nce a
police officer has a reasonable basis for believing there is probable cause, he is not required to
explore and eliminate every theoretically plausible claim of innocence before making an arrest."
*Ricciuti*, 124 F.3d at 128; *see also Seitz v. DeQuarto*, 777 F. Supp. 2d 492, 504 (S.D.N.Y. 2011)
(finding that police are not obligated to investigate claims of innocence, "even when the suspect
alleges that his or her innocence is based on mistaken identity.").

Second, Plaintiffs allege that they were not arrested because they matched a suspect's
description but rather because they "looked Hispanic." Pls.' Mem. 10. Along these lines,
Plaintiffs also claim that "[w]ere this Court to adopt Defendants' argument, then any and all
Hispanic males in their 20's who might have been observed in the predominantly Hispanic Wood
Avenue apartment complex that morning could have been lawfully arrested." *Id.* 11. The Court
finds Plaintiffs' argument unconvincing. As an initial matter, there is no admissible evidence
before the Court indicating that police were searching the Wood Avenue apartment complex
generally looking for Hispanic males. Rather, the evidence presented plainly demonstrates that
police were looking for a Hispanic male in his twenties who was specifically believed to reside
in Apartment # 6. Plaintiffs clearly fit that description. The Court GRANTS summary judgment
to the Officers on the federal false arrest claim. [13]

---

[13] The Court acknowledges that the parties dispute whether Plaintiffs were in fact arrested or merely seized for
purposes of an investigative stop. *See* Pls.' Mem. 8-9; Vill. Defs.' Mem. Law Supp. Defs.' Mot. Summ. Judg.
("Vill. Defs.' Mem.") 11-13, Doc. 53. However, as the Court has determined that the police had at least arguable, if
not actual, probable cause, it is unnecessary to determine whether the detentions constituted arrests.

### 3. Due Process Claim

Plaintiffs' second § 1983 claim alleges violations of their due process rights, however, Plaintiffs fail to specify whether they allege violations of their procedural or substantive due process rights.  The only discussion of due process in the Plaintiffs' papers is in the Amended Complaint, where they state that the "arrests and assaults of [P]laintiffs were without . . . legal process" and the conduct of the Officers violated their "Fourth and Fourteenth Amendment rights to due process and to not be arrested by the use of excessive force."  Am. Compl. ¶ 14, 20.

According to the Second Circuit, "[d]ue process requires probable cause for an arrest." *United States v. McDermott*, 918 F.2d 319, 325 (2d Cir. 1990).  Because the Court has already found that the Officers had probable cause to detain Torres, and by extension, probable cause to detain Plaintiffs, "there was no violation of [Plaintiffs'] substantive or procedural due process rights" regarding their detention.  *Carthew v. Cnty. of Suffolk*, 709 F. Supp. 2d 188, 202 n.12 (E.D.N.Y. 2010) (quoting *Clark v. Dowty*, No. 05 Civ. 1345 (WWE), 2007 WL 2022045, at *6 (D.Conn. Jul. 9, 2007)) (internal quotation marks omitted).  The Court GRANTS summary judgment to the Officers on the federal due process claim.

### 4. Excessive Force Claim

Plaintiffs' third § 1983 claim alleges that the Defendants used excessive force in detaining Abreu and Ortiz.  "A police officer performing a discretionary function enjoys qualified immunity from an excessive force claim unless (1) she violated a constitutional right (2) that was clearly established at the time of the alleged violation."  *Hodge v. City of Long Beach*, 425 Fed. App'x 33, 34 (2d Cir. 2011) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds* by *Pearson v. Callahan*, 555 U.S. 223 (2009)) (internal quotation marks omitted); *see also Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir. 1995) ("We have

19

previously held . . . that the qualified immunity defense is generally available against excessive

force claims.") (citation and internal quotation marks omitted).  A court reviewing the

reasonableness of the force used to effect a particular seizure under the Fourth Amendment must

engage in "careful balancing of the nature and quality of the intrusion on the individual's Fourth

Amendment interests against the countervailing governmental interests at stake."  *Hodge*, 425

Fed. App'x at 34 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (internal quotation

marks omitted).  This standard evaluates the reasonableness of the force used by "considering the

totality of the circumstances faced by the officer on the scene," *Lennon*, 66 F.3d at 425, and

includes three specific considerations: (1) the "severity" of the crime; (2) "whether the suspect

poses an immediate threat to the safety of the officers or others;" and (3) "whether the suspect is

actively resisting arrest or attempting to evade arrest by flight."  *Hodge*, 425 Fed. App'x at 34

(quoting *Graham*, 490 U.S. at 396) (internal quotation marks omitted).  These factors must be

weighed against the amount of force used by detaining officers.  *Hodge*, 425 Fed. App'x at 34.

In *Hodge*, the Second Circuit reversed a district court order denying summary judgment

to police officers on an excessive force claim stemming from a "potential severe" domestic

dispute where the suspect refused to cooperate with police requests to remove his hands from his

pockets and attempted to walk away from police.  *Id.* at 33-35.  The plaintiff alleged that officers

"spun him around with a forearm, grabbed his neck, put him in a bear hug, and pulled his arms

behind his back as they attempted to handcuff him, causing injuries and bruises to his back, and

abrasion on his arms and neck, and rendering him unable to swallow."  *Id.* at 34-35 (citation and

internal quotation marks omitted).  However, the plaintiff acknowledged that the incident

"happened quickly" and that he was never forced to the ground.  *Id.* at 35 (citation and internal

quotation marks omitted).  In determining that plaintiff's right to be free of excessive force was

not violated and that officers were entitled to qualified immunity, the panel noted that "because of the plaintiff's defiance and the indicia of a potential incident of domestic violence, it would not be 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  *Id.* (quoting *Saucier*, 533 U.S. at 202).

In opposition to Defendants' motions for summary judgment, Plaintiffs fail to cite any controlling authority to advance their argument that the events in question establish a claim for the use of excessive force.  According to Plaintiff Abreu, when he exited the apartment building, he complied with the police request to raise his arms and was subsequently thrown to the ground, handcuffed, had a gun placed on his back and near his face, was then picked up by his hands and forced against a barbed wire fence.  Abreu Dep. at 24-25, 59-60.  Abreu cannot identify, even after conducting discovery, who "pushed him to the ground or who handcuffed him, nor did he know the police department with which that officer was employed."  Cnty. Defs.' 56.1 Stmt. ¶ 25.  Moreover, the undisputed facts establish that neither Solomon nor Johnstone touched Abreu.  Vill. Defs.' 56.1 Stmt. ¶ 12-13.  This leaves Buckner as the only remaining Defendant who could have been involved in the actions against Abreu, although there is no evidence in the record to support this conclusion.

It is unfortunate that Abreu was pushed to the ground, handcuffed, and forced against the barbed wire fence, especially when he complied with police orders to raise his hands.  However, a reasonable officer could have believed that this amount of force was objectively reasonable as the wanted suspect had recently been involved in a serious domestic dispute involving a gun and was believed to still possess the weapon.  The Supreme Court has noted that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make

split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

The same analysis and result applies to Plaintiff Ortiz's claim of excessive force. According to Plaintiffs, after Abreu had been detained by police, Ortiz exited the building and police instructed him to get on the floor. Ortiz Dep. at 43. Instead of getting on the floor, Ortiz told the officers that he was turning around to put his hands on the wall, and officers ordered him once again to get on the floor. *Id.* at 44. After Ortiz failed to heed police's second request to get on the ground, Detective Buckner grabbed his right hand by the wrist and twisted it behind his back, and slammed him down to the ground. *Id.* at 44. Ortiz alleges that police then placed a shotgun in his face and told him to "shut the fuck up." *Id.* at 45. Immediately after being patted down, Ortiz was brought to where Abreu was being held and police apologized to both Abreu and Ortiz for their mistake. *Id.* at 47-48.

In their opposition papers, the Plaintiffs state that the force used by police was excessive, in part, because "Plaintiffs were fully cooperative and did nothing to provoke the Defendants' use of any force, much less such violent force." Pls.' Mem. 12. However, Ortiz's account of events confirms that he failed to comply with police orders twice by refusing to get on the ground and by stating that he was going to turn around to put his hands on the wall, despite police requests that he not do so. An officer aware of the earlier domestic dispute and the possibility that the suspect may have been armed was justified in reasonably viewing Ortiz's failures to obey police commands, and desire to turn his back on police, as an immediate threat to his own safety.[14] In light of these circumstances, "it would not be clear to a reasonable officer

---

[14] Plaintiffs question whether Torres "really *did* pose the sort of danger which would warrant the immediate forcible action used by the Defendants on the Plaintiffs" as Sergeant Johnstone merely issued Torres a traffic ticket on the morning of the day in question. Pls.' Mem. 15 (emphasis in original); Simplified Traffic Information at 10. The

that his conduct was unlawful in the situation he confronted." *Hodge*, 425 Fed. App'x at 35

(quoting *Saucier*, 533 U.S. at 202); *see also Husbands ex rel. Forde*, 335 Fed. App'x at 129

(punch to the stomach warranted to handcuff uncooperative suspect); *Lennon*, 66 F.3d at 426

(officer wrapping his arm around individual's neck, shoulder, and arm, and pulling her from a

vehicle was warranted to remove uncooperative individual from vehicle).

Finally, the Plaintiffs argue that the question of excessive force is a factual one which

must be answered at trial. Pls.' Mem. 12. However, courts in this district have exercised their

ability to make excessive force determinations at the summary judgment stage and this Court is

likewise entitled to evaluate Plaintiffs' claims on this matter. *See Faruki v. City of New York*, 10

Civ. 9614 (LAP), 2012 WL 1085533, at *6-7 (S.D.N.Y. Mar. 30, 2012) (granting defendants'

motion for summary judgment on plaintiff's excessive force claim); *Garcia v. Greco*, No. 05

Civ. 9587 (SCR) (JFK), 2010 WL 446446, at *7, 9 (S.D.N.Y. Feb. 9, 2010) (same). The Court

GRANTS summary judgment to the Officers on the excessive force claim.[15]

---

Court will not speculate as to the motivation behind Johnstone's actions when the record establishes that a
reasonable officer at the Wood Avenue apartment complex could have viewed suspect Torres as an armed and
dangerous individual.

[15] In relation to their excessive force claim, Plaintiffs allege that there are genuine issues of material fact as to which
individual Defendants failed to intercede and stop their physical detention by police. Pls.' Mem. 13. However,
Plaintiffs fail to provide further elaboration for their allegation. The Court must therefore speculate that Plaintiffs
are referring to the fact that both Chief Solomon and Sergeant Johnstone knew what suspect Torres looked like,
were present at the scene of the detention and allowed Plaintiffs to be physically detained by police despite knowing
their identities. Abreu Dep. at 29-31; Johnstone Dep. at 18. A police officer "has an affirmative duty to intercede
on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *Foy v.
City of New York*, No. 03 Civ. 7318 (HB), 2004 WL 2033074, at *3 (S.D.N.Y. Sept. 10, 2004) (quoting *O'Neill v.
Krzeminski*, 839 F.2d 9, 11 (2d Cir.1988)) (internal quotation marks omitted). This duty has been recognized to
extend to situations where an officer observes or has reason to know that excessive or unlawful force is being used.
*Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *Skorupski v. Suffolk Cnty.*, 652 F. Supp. 690, 694 (E.D.N.Y.
1987). However, "there can be no failure to intervene where there was no constitutional violation." *Foy*, 2004 WL
2033074 at *3. Plaintiffs' failure to intervene claim is fatally deficient because the detentions were lawful; they
were supported by probable cause and officers did not use excessive force in detaining Plaintiffs. The Court
dismisses this claim.

### 5. Equal Protection Claim

Plaintiffs' fourth § 1983 claim alleges that their rights were violated under the Equal Protection clause of the Fourteenth Amendment, which is basically a directive that all similarly situated individuals should be treated alike. *Frazier v. Woods*, 96 Civ. 7813 (JFK), 1998 WL 146231, at *5 (S.D.N.Y. Mar. 25, 1998) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). To establish an equal protection claim, a "[p]laintiff must show adverse treatment of individuals compared with other similarly situated individuals and that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Bishop v. Best Buy, Co. Inc.*, 08 Civ. 8427 (LBS), 2010 WL 4159566, at *11 (S.D.N.Y. Oct. 13, 2010) (quoting *Miner v. Clinton Cnty.*, 541 F.3d 464, 474 (2d Cir. 2008)) (internal quotation marks omitted). Plaintiffs claim that their equal protection rights were violated when they were detained by police based solely on their Hispanic origin and allege that after their detention, police told them, "[T]hrough the window you appeared to be Hispanic." Am. Compl. ¶ 1, 11, 13; Pls.' Mem. 13.

Defendants seek dismissal of the equal protection claim on the grounds that Plaintiffs have failed to allege or identify any similarly situated individuals who were treated differently by the Officers due to their race. Cnty. Defs.' Mem. 25-26. Indeed, in their opposition papers, Plaintiffs do not respond to Defendants' arguments that their equal protection claim should be dismissed, other than to argue that if Plaintiffs were Caucasian and the Defendants were searching for a Caucasian male in his twenties in a predominantly Caucasian apartment complex, "the Defendants would not have rushed up to them with guns drawn, slam[med] them to the ground and handcuff[ed] them without at least first asking who they were and why they were

there." Pls.' Mem. 13-14. Insofar as the Plaintiffs fail to offer evidence to show that Defendants treated them differently than others similarly situated to them, the Court GRANTS summary judgment to the Officers on the federal equal protection claim.

### D. State Law Claims

Under 28 U.S.C. § 1367(c)(3), the Court may decline to exercise jurisdiction over any non-federal claims over which it could have supplemental jurisdiction if the Court has dismissed all of the claims over which it has original jurisdiction. Subject matter jurisdiction in the instant action is based on federal question, 28 U.S.C. § 1331, and the jurisdictional counterpart to § 1983, 28 U.S.C. § 1343. Having disposed of all of Plaintiffs' federal claims, it would be inappropriate to adjudicate their state law claims. Therefore, the Court declines to retain jurisdiction over the state law claims and dismisses them without prejudice. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (stating that, if the federal claims are disposed of before trial, "the state claims should be dismissed as well.").

## III. Conclusion

For the foregoing reasons, the Court GRANTS the County Defendants' Motion for Summary Judgment on all of the federal claims against them. This Court declines to retain supplemental jurisdiction over the state law claims against them and therefore DISMISSES those claims without prejudice. The Clerk of the Court is respectfully directed to terminate this motion and enter judgment in favor of Defendants. Doc. 46.

The Court also GRANTS the Village Defendants' Motion for Summary Judgment on all of the federal claims against them. This Court declines to retain supplemental jurisdiction over the state law claims against them and therefore DISMISSES those claims without prejudice. The

Clerk of the Court is respectfully directed to terminate this motion and enter judgment in favor of Defendants.  Doc. 52.

Because Plaintiffs' federal and the state claims have been dismissed, the Court also DISMISSES the Defendants' cross-claims against each other.  The Clerk of the Court is respectfully directed to close this case.

It is SO ORDERED.


Dated: November 2, 2012
White Plains, NY


_____

Edgardo Ramos, U.S.D.J.

26